IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JAMES BETTENCOURT,                                CV 08-857-MA

       Plaintiff,                             OPINION AND ORDER

v.

MICHAEL ASTRUE,
Commissioner of Social
Security,

       Defendant.

MERRILL SCHNEIDER
Schneider Law Offices
P.O. Box 16310
Portland, OR 97292
(503) 255-9145

       Attorneys for Plaintiff

KENT S. ROBINSON
Acting United States Attorney
ADRIAN L. BROWN
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR  97204-2902
(503) 245-6309

1 - OPINION AND ORDER

DAVID R. JOHNSON
Special Assistant United States Attorney
701 Fifth Avenue, Suite 2900 MS/901
Seattle, WA  98104-7075
(206) 615-268-2545

    Attorneys for Defendant

MARSH, Judge.

    Plaintiff James Bettencourt seeks judicial review of the final decision of the Commissioner denying his September 24, 2004, applications for disability insurance income benefits (DIB) and supplemental security income (SSI) benefits pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-33, and Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83f, respectively.

    Plaintiff was 43 years old on the date of the final decision of the Commissioner.  He asserts he has been disabled since April 15, 2003, because of scoliosis of the spine, degenerative disc disease of the neck, and left knee problems.

    The Administrative Law Judge (ALJ) held a hearing on June 21, 2007, and issued a decision on July 24, 2007, finding that plaintiff was not disabled.

    Plaintiff timely appealed the decision to the Appeals Council.  On May 15, 2008, the Appeals Council denied plaintiff's request for review.  The ALJ's decision, therefore, became the final decision of the Commissioner for purposes of review.

2 - OPINION AND ORDER

Plaintiff contends the Commissioner's decision is not supported by substantial evidence and he seeks an order from this court reversing it and remanding the case either for further proceedings or for an immediate award of benefits.

For the following reasons, I **REMAND** the final decision of the Commissioner for further proceedings as set forth herein.

### THE ALJ'S FINDINGS

The Commissioner has developed a five-step sequential inquiry to determine whether a claimant is disabled. Bowen v. Yuckert, 482 U.S.137, 140 (1987). See also 20 C.F.R. § 404.1520. Plaintiff bears the burden of proof at Steps One through Four. See Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999). Each step is potentially dispositive.

At Step One, the ALJ found plaintiff has not engaged in substantial gainful activity since the alleged onset of his disability.

At Step Two, the ALJ found plaintiff suffers from scoliosis with degenerative disc disease, which is a severe impairment under 20 C.F.R. §404.1520(c)(an impairment or combination of impairments is severe if it significantly limits an individual's physical or mental ability to do basic work activities), and depression.

At Step Three, the ALJ found this impairment does not meet or equal a listed impairment.

The ALJ found plaintiff has the residual functional capacity to perform light-to-medium work that does not involve constant overhead reaching.  Plaintiff also has mild depression that limits him to simple 1-2-3 step work with only occasional public interaction.

At Step Four, the ALJ found plaintiff is able to perform his past relevant work as a building maintenance worker and janitor, and that such work exists in substantial numbers in the national economy.

The ALJ also made an alternative finding at Step Five that plaintiff could work as a production assembler or industrial cleaner if he were to be unable to perform his past relevant work.

Accordingly, the ALJ found plaintiff was not disabled and denied his claim for DIB and SSI benefits.

## ISSUES ON REVIEW

Plaintiff asserts the ALJ erred by (1) failing to find plaintiff suffers from severe degenerative disease of the neck and severe depression, (2) rejecting the opinions of his treating physicians, (3) not adequately assessing plaintiff's residual functional capacity.

4 - OPINION AND ORDER

## LEGAL STANDARDS

**Burden of Proof**.

The initial burden of proof rests on the claimant to establish disability.  Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996).  To meet this burden, a claimant must demonstrate the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).

The court must weigh all of the evidence whether it supports or detracts from the Commissioner's decision.  Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986).  The Commissioner's decision must be upheld, however, even if the "evidence is susceptible to more than one rational interpretation."  Andrews, 53 F.3d at 1039-40.

The Commissioner bears the burden of developing the record. DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991). The duty to further develop the record, however is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence. Mayes v. Massanari, 276 F.3d 453, 459-60 (9th Cir. 2001).

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir.), cert. denied, 121 S. Ct. 628 (2000).

"If additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded." Lewin v. Schweiker, 654 F.2d 631, 635 (9th Cir. 1981).

### RELEVANT RECORD

**1.  Plaintiff's Evidence.**

Plaintiff's evidence is drawn from plaintiff's disability and work history reports, and his hearing testimony.

Education/Work History.

Plaintiff has an eleventh grade education. He last worked in April 2003, laying roof shingles. The job ended when the available work slowed up. His prior work involved landscape and building maintenance, dishwashing, janitorial jobs, and roofing.

Physical Impairments.

Plaintiff feels a burning sensation like pins and needles in his neck on a daily basis.  He wears a cervical brace for one-half hour at a time three or four times a day.  It relieves the pressure on the nerves in his neck.  After he takes the brace off, he feels better for "a couple of hours" until he needs to put the brace on again.  He is prescribed methadone, oxycodone, and Tylenol 4 to relieve his pain symptoms, and Flexeril to relax his muscles.

Plaintiff suffers from sharp, shooting, and aching pains in his neck that are exacerbated by sitting or standing too long. He is able to sit for up to one hour and to stand for between 20-45 minutes at a time.  He is also losing strength in his left arm because of numbness and tingling caused by pinched nerves.

Plaintiff suffers from headaches four or five times a week. He was also getting migraine headaches two or three times a month, but they have subsided to once or twice a month.

Plaintiff lays down for 45 minutes two-to-three times a day to perform stretching exercises.

Plaintiff walks around his neighborhood for exercise and is able to walk one block before resting and easing the pain in his lower back.  Twice a day, plaintiff is also able to lift 10 lbs for a few seconds, and occasionally, for a few minutes.

<u>Mental Impairments</u>.

Plaintiff suffers from severe depression that involves feelings of loneliness, anxiety, and uselessness.  He overeats, isolates, and has suicidal thoughts on a daily basis.  He is prescribed Prozac, which helps him to mellow out.

<u>Daily Activities</u>.

Plaintiff lives with his 18 year-old daughter.  He cleans the area around his bedroom and does his own laundry.  He has difficulty pulling big loads out of the washing machine.  He eats mostly microwave dinners because he has difficulty standing long enough to cook major dinners.

Plaintiff uses public transportation but has difficulty walking to the bus stop.  The hard seats on the bus, along with sudden stops and starts, exacerbate his neck pain.

Plaintiff avoids shopping in grocery stores or at malls because he is paranoid around people.  He recently got a puppy and enjoys taking it for walks in his back yard.

Plaintiff likes to draw but has difficulty concentrating. He sleeps poorly because of pain but gets 6-7 hours of uninterrupted sleep.

Plaintiff uses marijuana four times a month.  He stopped drinking in 2006 because alcohol made him more depressed.

2.   **Medical Treatment Records**.

Tyrone Wei, D.C. - Chiropractor.

Dr. Wei examined plaintiff in 1995 for complaints relating to his plaintiff's cervical spine.  An x-ray showed moderate disc space narrowing with mild-to-moderate anterior hypertrophic changes in plaintiff's cervical spine.  Dr. Wei diagnosed moderate degenerative changes at C4-5-6-7, mild levo-cervicothoracic scoliosis (left-side curvature of the spine), and minimal degenerative changes at L4-5-SI of the lumbar spine.

Oregon Health Sciences University (OHSU).

In November 2004, plaintiff was treated for back pain at OHSU.  On her initial examination, Ashley Hyder, M.D., a family practitioner at OHSU's Richmond Clinic, noted plaintiff appeared well and was in no acute distress.  He exhibited limited range of motion with flexion and extension in the neck, with pain when he looked to the left.  He had tenderness over the lower cervical spinous processes and lower lumbar region on the left side.  He did not have any muscle spasms.  An x-ray of the cervical spine revealed marked disc space narrowing at C3-4, C4-5, and C5-6, with advanced degenerative disc disease and uncovertebral hypertrophy and straightening throughout the midcervical spine.  An x-ray of the thoracic spine showed a prominent mid-thoracic dextroscoliosis (right-side curvature of the spine) with mild degenerative changes.

9 - OPINION AND ORDER

Based on these findings, Dr. Hyder diagnosed neck pain secondary to significant scoliosis and prescribed Piroxicam, an anti-inflammatory medication, and Flexeril.  Plaintiff was shown low back strengthening exercises and instructed to use warm compresses and to stretch for 15 minutes to avoid morning stiffness.

In November 2005, Dr. Hyder stated plaintiff had been her patient for "more than a year," although the record does not contain any medical reports she authored beyond her initial evaluation.  She opined that plaintiff suffers from severe dextroscoliosis with cervical radiculopathy and is unable to stand for any period of time.  He needs to change positions so often that he could not sit for more than two hours in a work day.  He is unable to lift more than 10 lbs.  Based on these limitations, Dr. Hyder opined that plaintiff is "unable to do any physical work."

In August 2006, Safina Koreishi, M.D., also a family practitioner at OHSU's Richmond Clinic, wrote that plaintiff had been a patient at the clinic for "nearly two years."  She repeated verbatim Dr. Hyder's opinion regarding plaintiff's workplace limitations and signed a letter remarkably similar to the letter signed by Dr. Hyder nine months earlier opining that plaintiff was unable to perform physical work.  She also opined

10 - OPINION AND ORDER

plaintiff's condition "will likely worsen despite our pain management and exercise suggestions."  As with Dr. Hyder, there are no medical records authored by Dr. Koreishi reflecting any treatment she provided to plaintiff in the preceding two years.

On January 29, 2007, plaintiff saw Dr. Koreishi with a complaint of lower back pain after sliding down two steps in his basement.  Plaintiff had no numbness or tingling and walked well. Plaintiff was depressed and requested refills of methadone and oxycodone.  Dr. Koreishi diagnosed a depressive disorder, lumbago, cervicalgia, and osteoarthrosis.  On examination plaintiff had a mildly depressed affect but was smiling.  His gait was normal, but he complained of tenderness in the lumbar spine area.

On February 13, 2007, Dr. Koreishi completed a questionnaire submitted by plaintiff's counsel.  She checked boxes opining that plaintiff suffers from severe depression, degenerative joint disease of the neck, and arm numbness that prevent him from lifting heavy objects and sitting or standing for a "long time." She also checked a box indicating plaintiff had neurological deficits that were severe enough to meet Listing 1.04A, relating to spine disorders.

Dr. Koreishi opined plaintiff could occasionally lift 20 lbs, frequently lift 10 lbs, stand/walk for 15 minutes at a time,

for a total of one hour in an eight-hour day, sit for one-two hours at a time, for a total three hours in an eight-hour day. Plaintiff should never climb, balance, stoop, kneel, crouch, crawl, or reach overhead.  He has only occasional gross/fine manipulation ability and skin feeling.  He should avoid frequent exposure to extreme cold, extreme heat, wetness, humidity, noise, vibration, fumes, and he should avoid occasional exposure to hazards such as machinery and heights.

Dr. Koreishi also checked boxes to the effect that plaintiff suffers from pervasive loss of interest, sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating and thinking.  She opined that plaintiff suffers from a moderate impairment as to concentration, persistence and pace, a moderate limitation in social functioning, a marked restriction in daily activities, repeated episodes of decompensation, all of which would result in plaintiff missing more than two days a month at work involving even sedentary jobs.  Dr. Koreishi concluded that plaintiff "has a history of suicidal ideation, severe depression, and severe pain, which requires frequent office visits," and which would increase if plaintiff was placed in a competitive work environment.

On February 27, 2007, Dr. Koreishi again examined plaintiff for complaints of depression, continued neck and back pain, and migraine headaches.  Dr. Koreishi prescribed medications, which plaintiff was uncertain he could pay for because he lacked insurance.

<u>Cascadia Behavioral Healthcare - Urgent Walk-In Clinic.</u>

On October 9, 2006, plaintiff visited this clinic on the advice of Dr. Koreishi.  He appeared to be in pain with slow speech and body movement.  He was "substantially withdrawn and [spoke] in a near whisper," giving "brief answers."  He stated that he "became increasingly suicidal when his pain increased."  Plaintiff's GAF score on this occasion was rated at 25 (inability to function in almost all areas).

**3.    Examining Physician Records.**

<u>Kim Webster, MD. - Family Practitioner</u>.

In November 2004, Dr. Webster examined plaintiff at the request of the Commissioner.  Plaintiff's chief complaints were neck, low back, and left knee pain.

Plaintiff stated he had suffered from neck and low back pain all his life.  Previous chiropractic care had either not helped or had worsened his condition.  His neck pain had progressively worsened over the past two months.  He had occasional tingling, numbness, and weakness in his left arm.  His back pain caused him to be stiff in the morning.

Plaintiff stated his knee pain did not bother him much. Sitting was not a problem.  He was able to stand 4-5 hours, walk about one mile, and lift about 50 lbs.

Plaintiff's daily activities include cooking, cleaning, and doing puzzles.

Dr. Webster's neurological examination was normal.  He found no objective evidence that plaintiff's ability to sit, stand, walk, lift, or carry was limited or that plaintiff had any manipulation or postural limitations.

**4.    Consulting Physician Records.**

Sharon Eder, M.D. - Internal Medicine.

Dr. Eder reviewed plaintiff's medical records and opined they reflect plaintiff has medically determinable impairments that include marked cervical degenerative disc disease and hypertrophy, and mild thoracic degenerative disc disease and scoliosis.  She states plaintiff's impairments "could reasonably limit his functioning" but she questioned his credibility based on his statement to Dr. Webster that he could lift 50 lbs.

**DISCUSSION**

Plaintiff asserts the ALJ erred by (1) failing to find plaintiff suffers from severe degenerative disease of the neck and severe depression, (2) rejecting the opinions of his treating physicians, (3) not adequately assessing plaintiff's residual functional capacity.

14- OPINION AND ORDER

1.  **Severity of Plaintiff's Neck Pain**.

    Plaintiff contends the ALJ erred at Step Two in failing to find plaintiff's impairments relating to degenerative disease of the neck and depression were not severe, and disregarding them in determining plaintiff's residual functional capacity.

    The Commissioner, however, argues that although the ALJ may have erred in not labeling these impairments as "severe," such error was harmless because the ALJ's Step Three residual functional capacity finding specifically took them into account as severe impairments.  See <u>Burch v.Barnhart</u>, 400 F.3d 676, 679 (9th Cir. 2005)("A decision of the ALJ will not be reversed for errors that are harmless").

    I agree.  As set forth below, the record reflects the ALJ, in his Step Three finding, appropriately considered plaintiff's neck complaints and depression:

> X-rays showed degenerative changes at C4-5, C5-6, and C6-7 with spurring and disc space narrowing. . . .  He was diagnosed with neck pain secondary to compensation due to scoliosis.

> At a November 2004 consultative examination the claimant reported his life-long neck pain had worsened over the past two months. He complained of occasional left arm numbness and weakness. . . .

> In February 2007 [plaintiff] exhibited full range of motion in the neck.  There was pain with elevation of the arms. . . .

> There is no evidence to support his
> allegations of left arm weakness.  He
> exhibits normal strength of the upper
> extremities with good strength bilaterally.

AR at 20-21.

The ALJ also found plaintiff's testimony regarding his physical limitations was not credible based on his self-report to Dr. Webster that he was able "to stand 4-5 hours, walk about one mile, and lift about 50 lbs."

The ALJ also specifically addressed the severity of plaintiff's depression:

> [Plaintiff's] depressive symptoms are
> generally controlled with medication but at
> times he has been unable to afford his
> medications. [Plaintiff] underwent a
> psychiatric assessment in October 2006 after
> reporting he had taken an overdose of
> Flexeril and Amitriptyline 1 ½ weeks prior.
> On mental status examination he exhibited
> psychomotor retardation and depressed, angry
> effect.  He was diagnosed with major
> depressive disorder and marijuana abuse.  He
> reported Effexor had worked well for his
> depression but he had run out of medication
> and had lost his health insurance.  It was
> determined he did not require hospitalization
> . . .  In January 2007 [plaintiff] was
> described as exhibiting a mildly depressed
> affect, smiling. . . .     In February 2007
> he reported poor concentration, thoughts of
> suicide, and no energy.

AR at 21.

The ALJ noted a GAF score of 25 (inability to function in almost all areas) assigned to plaintiff in October 2006 when he

16 – OPINION AND ORDER

was seen at the Cascadia Urgent Walk-In Unit.  The ALJ also noted that plaintiff's condition did not lead to his hospitalization and there was no evidence of ongoing symptoms that would require hospitalization.  The ALJ also found plaintiff's credibility as to the severity of his psychological limitations was "undermined by inconsistencies in his reports of alcohol and drug use."

The ALJ summed up by concluding that plaintiff "has consistently been capable of functioning independently even while receiving minimal treatment."  AR at 21.

On this record, I conclude the ALJ should have made a specific finding that plaintiff's neck pain and depression were both severe impairments, but his error in failing to do so was harmless because he adequately addressed the severity of those impairments in determining plaintiff's residual functioning capacity.

## 2.    **Rejection of Opinion of Treating Physicians.**

Plaintiff contends the ALJ erred in failing to give clear and convincing reasons for rejecting the disability opinions of Dr. Hyder and Dr. Koreishi.

The opinions of treating doctors are given more weight than the opinions of doctors who do not treat the claimant.  "An ALJ may reject the uncontradicted medical opinion of a treating physician only for clear and convincing reasons supported by substantial evidence in the record."  Reddick v. Chater, 157 F.3d

17- OPINION AND ORDER

715, 725 (9th Cir. 1998)(internal citations omitted).  If a treating physician's medical opinion is supported by medically acceptable diagnostic techniques and is not inconsistent with other substantial evidence in the record, the treating physician's opinion is given controlling weight.

As noted above, Dr. Hyder and Dr. Koreishi each offered remarkably similar opinions in November 2005 and August 2006, respectively, that plaintiff is unable to do any physical work. Dr. Hyder stated plaintiff had been under her care for "greater than one year" and Dr. Koreishi stated he had treated plaintiff for "nearly two years."  There are, however, no medical reports in the Administrative Record gathered by the Commissioner that reflect such ongoing treatment by Dr. Hyder or Dr. Koreishi, at least before they offered their disability opinions.

In February 2007, Dr. Koreishi also answered questions submitted by plaintiff's counsel on a preprinted form that supported plaintiff's disability claim and included a finding that plaintiff's neck impairments met the requirements of Listing 1.04A.

The ALJ rejected the opinions of Dr. Hyder and Dr. Koreishi regarding the severity of plaintiff's physical impairments and the functional limitations flowing from them.  The ALJ, instead, relied on a medical report from by Dr. Webster, an evaluating

physician, who examined plaintiff within a month of Dr. Hyder's first examination, and who described much less severe functional limitations.

The ALJ also rejected Dr. Koreishi's opinion that there is evidence of "nerve root compression" and "motor loss" that is "accompanied by sensory or reflex loss" sufficient to meet Listing 1.04A.  The ALJ correctly pointed out there was no evidence in the medical record other than Dr. Koreishi's opinion, offered without any medical report to substantiate it, to support a finding of "cervical radiculopathy" or other "neurological abnormalities" that would be sufficient to meet that Listing.

On this record, I conclude the ALJ gave clear and convincing reasons for accepting the medical opinion of Dr. Webster, even though he examined but did not treat plaintiff, over the opinions of Dr. Hyder and Dr. Koreishi, who both treated plaintiff.  In that regard, I give considerable weight to the absence of any evidence in the record that reflects ongoing, longitudinal medical treatment provided by Dr. Hyder and/or Dr. Koreishi to plaintiff before they signed their substantially identical opinions regarding plaintiff's functional limitations.

Accordingly, on the record as it stands now, I conclude the ALJ did not err in accepting Dr. Webster's medical opinion over those of Dr. Hyder and Dr. Koreishi.

3.  **Adequacy of ALJ's RFC Assessment.**

I conclude the ALJ took into account and appropriately evaluated the medical record as it now exists relating to plaintiff's physical impairments and mental impairments. Nevertheless, I am troubled that Dr. Hyder and Dr. Koreishi seem to imply, at the least, that their opinions were informed by their treatment of plaintiff on an ongoing basis for one and two years respectively.  There should be records of those treatments if they occurred.

Plaintiff addresses the sparsity of medical records, noting the record as a whole "include[s] only a few physical or mental examinations of plaintiff, particularly OHSU's Richmond Clinic." Those particular medical records are critical because the medical opinions of Dr. Hyder and Dr. Koreishi that plaintiff is disabled are the foundation on which his disability claim lies.

Plaintiff correctly points out the Commissioner has the responsibility to develop the record.  For this reason, I conclude a remand is appropriate for the limited purpose of allowing the Commissioner the opportunity to insure that the Administrative Record is complete, and includes all medical reports, chart notes, or other documents from the Richmond Clinic reflecting any evaluation and/or treatment of plaintiff from November 2004 through August 2006.  If such additional records are found, the present Administrative Record shall be

supplemented by those records, and the ALJ shall reevaluate plaintiff's residual functional capacity in light of the additional records.

## **CONCLUSION**

For the reasons stated above, the Commissioner's final decision denying benefits to plaintiff is **REMANDED** for further proceedings as set forth herein.

IT IS SO ORDERED.

DATED this 19 day of October, 2009.

/s/  Malcolm F. Marsh
MALCOLM F. MARSH
United States District Judge

21- OPINION AND ORDER